E-FILED
Tuesday, 04 May, 2021  01:54:17 PM
Clerk, U.S. District Court, ILCD

**IN THE UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS, SPRINGFIELD DIVISION**

GORDON W. WAINMAN,    )
    )
       Plaintiff,    )
    )
    v.    )    Case No. 20-cv-3140
    )
ANDREW SAUL,    )
Commissioner of    )
Social Security,    )
    )
       Defendant.    )

## OPINION

TOM SCHANZLE-HASKINS, U.S. MAGISTRATE JUDGE:

Plaintiff Gordon W. Wainman appeals from the denial of his application for Social Security Disability Insurance Benefits (Disability Benefits) under Title II of the Social Security Act. 42 U.S.C. §§ 416(i) and 423. This appeal is brought pursuant to 42 U.S.C. § 405(g). Wainman filed a Brief in Support of Motion for Summary Judgment (d/e 16). The Defendant Commissioner filed a Motion for Summary Affirmance (d/e 17). Wainman filed Plaintiff's Reply Brief to Defendant's Motion for Summary Judgment (d/e 18). The parties consented to proceed before this Court. Consent to the Exercise of Jurisdiction by a United States Magistrate Judge and Reference Order entered November 30, 2020 (d/e 15). For the reasons set forth below, the Decision of the Commissioner is AFFIRMED.

BACKGROUND

Wainman was born on July 18, 1963, graduated from high school, and completed additional technical training in heating and air conditioning. He previously worked as a letter carrier, foam charger, cable television installer, and a mail sorter.  Wainman alleged that he became disabled on July 23, 2015 (Onset Date).  He suffers from degenerative disc disease status post fusion C3-4, quadriparesis, cervical myelopathy, and obesity. The Administrative Law Judge (ALJ) determined that Wainman became disabled on the day before his 55th birthday, July 17, 2018, but he was not disabled before that date.  The ALJ's decision became the final decision of the Defendant Commissioner.  Wainman appeals the decision that he was not disabled for the three-year period from the Onset Date July 23, 2015 to July 17, 2018.  Certified Transcript of Proceedings before the Social Security Administration (d/e 9) (R.), 1, 14, 23-25, 46-50, 905.

STATEMENT OF FACTS

Evidence Before the Evidentiary Hearing

On August 5, 2014, Wainman saw his neurosurgeon Dr. Arden Reynolds, M.D., for a postoperative follow up.  Dr. Reynolds had diagnosed Wainman with cervical spondylosis with myelopathy.  On February 12, 2014, Dr. Reynolds surgically performed a microdiscectomy and fusion at

C3-4 to address this problem.  Dr. Reynolds stated that Wainman was making significant progress.  He had occasional paresthesia in the right C6 dermatome and had persistent right grip weakness and spastic reflexes. Dr. Reynolds left Wainman at his postoperative lifting restrictions for another six to eight weeks.  R. 358; <u>see</u> R. 411 (setting forth date of type of surgery).

On June 8, 2015, Wainman saw physician's assistant Laura A. Wroge, PA-C, for a tick bite.  R. 396.  On examination, Wainman was alert, oriented, and in no distress.  His extremities were normal with full range of motion.  Wroge prescribed medication for the tick bite.  R. 402.

On July 28, 2015, Wainman saw his primary care physician Dr. Scott R. Kimber, M.D., for neck pain which began on the Onset Date July 23, 2015.  On July 22, 2015, a day before the Onset Date, Wainman carried heavier than average packages on his route as a letter carrier.   The pain improved from July 23 to July 28, 2015 and he reported numbness in his left arm and shooting pains down both arms.  He also reported aching and sharp pain in his lower neck/cervical spine and rated the pain as 6/10. Wainman had paresthesia in both upper extremities from the deltoids to his fingers and had "subtle/minimal" weakness in his hands, with intermittent shooting pains and numbness in his right arm.  R. 411.  On examination,

Wainman was alert, cooperative, and in no distress; he had diminished range of motion in his neck; he had normal range of motion in his back; his extremities were normal; and he had 5/5 strength in his upper and lower extremities and no sensory deficits.  R. 412-13.  Dr. Kimber prescribed prednisone, baclofen, and gabapentin for the pain, and also recommended ice, heat, rest, and over-the-counter Tylenol as needed for the pain.  He offered Wainman physical therapy, but Wainman declined.  Dr. Kimber wrote a note stating that Wainman was off work from the Onset Date through August 2, 2015.  R. 414.

On August 13, 2015, Wainman saw nurse practitioner Anita L Arnold, NP, in Dr. Reynolds' office.  He reported that he stepped in a hole when his pain began in July 2015, and overall, he was doing well and wanted to be cleared to go back to work.  R. 424.  On examination, Wainman showed cervical tightness and guarded range of motion in his neck; he had grip weakness in both hands; however, his deltoids, biceps, triceps, and grips were intact; his gait was steady, and his lower extremity muscle groups had 5/5 strength.  He had some fatigability and paresthesia increasing in his right hand.   Arnold released Wainman to work with a lifting restriction of 35 to 70 pounds, but no overhead lifting, and no overtime.  The restrictions

were the same that Dr. Reynolds gave in September 2014.  Arnold also

referred him to physical therapy for evaluation.  R. 424.

On August 19, 2015, Wainman saw physical therapist Amy Yocum,

PT.  He had tried to go back to work, but his employer the U.S. Postal

Service required completion of a work ability form.  Wainman said he was

not currently working and reported that he tried to pick up some sticks

outside his home and pain shot down his right arm.  He then felt dizzy

when he went back inside his home and reported continuing pain,

numbness, and tingling in his right upper extremity and pain in his left

upper extremity.  R. 429.  On examination, Wainman had limited range of

motion in his neck; his neck and upper extremity strength ranged from 3+/5

to 4-/5; and he had decreased sensation to light touch to C6 and C8

dermatomes on his right upper extremity.  Physical therapist Yocum

assessed decreased motion, strength, posture, pain, and joint/soft tissue

dysfunction.  R. 430.  Yocum recommended four to six weeks of physical

therapy.  R. 431.

On September 1, 2015, Wainman saw Dr. Reynolds.  The physical

therapy did not significantly alleviate his symptoms; however, the baclofen

and gabapentin helped.  R. 461.  On examination, Wainman had a rigid

spasm in his trapezius and rhomboid muscles; he had some weakness in

his deltoids (4+/5), biceps (4/5), triceps (3/5), and his grip (3/5); his lower extremity muscles had 5/5 strength but increased tone; and he had hyperactive and spastic reflexes.  X-rays showed ossification in the longitudinal ligament and posterior longitudinal ligament; a congenital small canal; reduced canal space at C4-5, C3-4, and C5-6, which indicated bony stenosis; and diffuse idiopathic skeletal hypertrophy (DISH syndrome).  Dr. Reynolds said that Wainman had either a partially healed spinal cord compression or, more likely, ongoing cord compression from cervical stenosis throughout the cervical spine.  Dr. Reynolds instructed Wainman to stay off work and stop physical therapy and ordered a CT scan, a cervical MRI, and a functional capacity evaluation.  R. 462.

On October 20, 2015, Wainman saw Dr. Reynolds.  On examination, Dr. Reynolds told Wainman that he "was trying to make himself appear weak when he was not.  He was able to stop doing that, and he has full strength in his arms."  Cervical x-rays showed that the C3-4 fusion was "solid," and Wainman had spontaneous fusions at C4-5 and C5-6.  A cervical MRI showed no evidence of spinal cord or nerve root compression. Dr. Reynolds said that Wainman either had bad biomechanics in his grips or he was trying to look weaker than he was.  Dr. Reynolds cleared Wainman to work with a lifting limit of 20 pounds frequently and 40 pounds

infrequently, a restriction of no overhead reaching, and a 40-pound limit on pushing and pulling.  R. 480.

On November 3, 2015, Wainman saw Dr. Kimber.  On the second day that Wainman returned to work, October 27, 2015, he had back pain that radiated up to his shoulders, down his arms, and across his chest.  He complained of pain, tightness in his chest, and shortness of breath and was admitted to the hospital and discharged October 28, 2015.  The diagnosis was non-cardiac chest pain.  R. 484.  On examination, Wainman was alert, cooperative, and in no distress; he had tenderness in his neck, limited range of motion in his neck, and left paraspinous spasm; his extremities were normal.  An MRI performed on October 23, 2015 showed disk bulges at C7-T1, C3-C4, C4-C5, and C5-C6 (mostly mild to moderate); degenerative central spinal stenosis at C6-C7 with neural narrowing at C7, right greater than left.  R. 487.  Dr. Kimber gave Wainman a note excusing him from work for two weeks.  R. 487.

On November 5, 2015, Wainman saw Dr. Reynolds.  Wainman had bilateral grip weakness, but otherwise his strength was good.  He had spastic reflexes in his triceps and knees and his biceps were hypoactive. Dr. Reynolds said the October 23, 2015, MRI did not explain these results and he ordered a cervical myelogram and took Wainman off work.  R. 492.

On February 11, 2016, Wainman saw Dr. Reynolds.  The cervical myelogram was completed on February 6, 2016 and showed ossification of the posterior longitudinal ligament with spinal cord compression at C4-5, C5-6, and C6-7, with right-sided cord flattening at all three levels, and foraminal stenosis on the left greater at C6-7 than at C4-5 and C5-6.  Dr. Reynolds assessed ossification of the posterior longitudinal ligament, segmental type extending from C3-C7 (a variant of DISH syndrome) and recommended C3-C7 laminectomy with bilateral micro foraminotomies.  R. 555-56.

On May 10, 2016, Dr. Reynolds performed laminectomy and bilateral micro foraminotomies at C3-4, C4-5, C5-6, and C6-7.  R. 343-44.

On May 23, 2016, Wainman saw nurse practitioner Arnold for a post-op follow up examination.  He reported that "overall he has been getting along well" and had a pulling sensation sometimes when he extended or stretched his arm.  Arnold removed the staples in Wainman's neck at the incision site.  On examination, Wainman had no signs of drainage or infection at the incision; his range of motion in his neck was guarded; his upper extremity strength was intact; and the nerve pain in his right arm was significantly improved.  Arnold directed Wainman to walk 30 minutes a day without stopping and to avoid bending and twisting.  Arnold gradually

increased Wainman's lifting restriction from five to ten to fifteen pounds over the next four weeks.  R. 574-75.

On June 28, 2016, Wainman saw nurse practitioner Arnold for a six-week post-op examination.  He sometimes still had shooting pains throughout his shoulders and was trying to increase his activity.  He had some numbness in his right arm and had heat and cold sensitivities in his upper extremities.  R. 579.  On examination, Wainman had improved range of motion in his neck; his upper extremity muscle strength was 5/5, including his grips; his gait was steady; and his nerve pain was mild to moderate.  Arnold determined that Wainman was not able to work at this time.  R. 580.

On August 15, 2016, Wainman saw Dr. Reynolds for a three-month follow up after his surgery.  Dr. Reynolds said that Wainman had "the usual numbness" that "would not even start to get better for 3 to 4 months."  Dr. Reynolds stated that his strength was good except for mildly weak grips and that he had no intrinsic weakness in his hands.  Dr. Reynolds said that Wainman should start physical therapy to increase flexibility in his neck, shoulders, and arms.  R. 589.

On September 27, 2016, Wainman saw Dr. Reynolds.  He said he had a "near syncopal episode from a hug he received while at a visitation."

R. 664.  Wainman had extreme pain on extension of his neck.  On

examination, he had spastic reflexes at his knees, worse of the left; his grip

strength was 4-/5 and his intrinsic muscles were 4+/5; his biceps, triceps,

and deltoids were all 5/5 strength.  Dr. Reynolds stated that Wainman had

preexisting cervical stenosis before the Onset Date incident due to his

DISH syndrome.  Stepping in a hole on or about the Onset Date caused

cervical root and cord contusions. The root contusions caused weakness in

Wainman's arms and the cord contusion caused persistent pain and

spastic reflexes.  Dr. Reynolds said Wainman would never have normal

flexion or extension of his neck due to fusions in his neck from C2-T1 as a

result of the 2014 surgery and spontaneous fusions from DISH syndrome.

He also had a Klippel-Feil posteriorly between C2 and C3.  Dr. Reynolds

said that the goal of physical therapy was to maintain rotation at C1-2 and

diminish muscle spasms.  Trying to otherwise increase cervical motion

would cause "agonizing pain and should be avoided."  R. 655.  Wainman

thereafter underwent physical therapy from September through December

2016.

On September 29, 2016, Wainman saw Dr. Kimber.  He reported

increased pain in his neck and across his shoulders.  On examination,

Wainman was alert and in no distress; his neck was supple with no

tenderness; his extremities were normal; and his sensation was intact.  R. 662-63.

On November 8, 2016, Wainman saw Dr. Reynolds who noted that Wainman had more range of motion in his neck than expected.  According to Dr. Reynolds, Wainman's recovery was "exactly on schedule."  He was "starting to make progress in strength recovery."  Wainman's gait was slightly broad-based and unsteady, his grips and intrinsic muscles strengths were 4/5, and his deltoids, biceps, and triceps strength were 4+/5.  Some of his reflexes were still spastic and Dr. Reynolds stated that Wainman could not safely return to work "because of unsteady gait and because of rapid fatigue, but he is making steady progress."  R. 734.

On November 29, 2016, Wainman saw nurse practitioner Arnold. Wainman reported that a relative gave him a hug at a family reunion two to three weeks earlier and the hug caused intense pain in his mid to upper back and shooting pains in his arms.  The pain was slowly going away, but he skipped some physical therapy sessions due to the pain.  He was "getting more back to normal", however burning pains in his arms at times woke him up at night.  R. 760-61.  On examination, Wainman had more range of motion in his neck with no spasms and no tenderness; he moved all of his extremities without difficulty; he had 4/5 strength in his grips and

intrinsic muscles and 4+/5 strength in his deltoids, biceps, and triceps; his gait "overall" was steady; and his neuropathic nerve pain was mild to moderate at times.  Arnold said that Wainman was slowly improving.  She told Wainman to continue with the current plan for his recovery and to resume physical therapy.  R. 761.

On January 4, 2017, Wainman saw Dr. Reynolds.  The pain persisted in his shoulder, neck, and arms from the "repeated hugging experiment." On examination, Wainman was alert, cooperative, and uncomfortable; his strength was 4/5 in his grips, 4+/5 in his intrinsic muscles, and 5/5 in his biceps, triceps, and deltoids; he had spastic reflexes in his knees and his reflexes were absent in his ankles.  Wainman mentioned applying for disability, and Dr. Reynolds thought applying was "an excellent idea."  R. 611.

On April 5, 2017, Wainman saw Dr. Reynolds.  His condition was stable.  He had "fatigability" in his upper extremities and spastic reflexes. Dr. Reynolds opined that stepping in a hole on or about the Onset Date resulted in a "traumatic spinal cord injury."  R. 640.  Dr. Reynolds further opined, "At this point in time, his pain and neurologic exam in my opinion are permanent.  I do not think he will be capable of returning to the workforce."  Dr. Reynolds continued, "I have recommended that he apply

for Social Security disability."  Dr. Reynolds asked Wainman to see if

another physician could take over his pain management.  R. 641.

On May 11, 2017, Wainman saw Dr. Kimber to take over his pain

management.  He reported chronic pain in his upper back and lower

cervical spine and rated his pain at 10/10 at worst and 6-7/10 on average

and constant.  Dr. Kimber noted that Wainman had not undergone pain

management services before.  R. 856.  On examination, Wainman was

alert, cooperative, and uncomfortable; he had diminished range of motion

in his neck; he had tenderness to palpation over the lower cervical spine

without crepitance or step-off; he had normal muscle tone and spastic

reflexes in his upper extremities; his strength was 4+/5 in his upper

extremities with fatigability, and his grip strength was 4/5 with fatigability.

R. 858.  Dr. Kimber ordered an MRI of Wainman's cervical spine and

increased his Norco 10/325 (hydrocodone/acetaminophen) dosage to one

tablet every six hours.  R. 859-60.

On May 18, 2017, Wainman had an MRI of his cervical spine which

showed the 2014 fusion was stable and the 2016 laminectomy surgery

resolved his spinal canal stenosis.  The MRI also showed stable cervical

spondylosis, including severe degenerative foraminal stenosis at C6-7.  R.

894.

On August 1, 2017, Wainman saw pain specialist Dr. Howard Dedes, M.D.  Wainman reported pain across his shoulders and upper back down into his right arm and numbness and tingling in his thumb and first digit of his right hand.  His pain increased with temperature changes and walking and was at 6/10.  Wainman said the pain interfered "with the function and quality of life in the following manner:  General Activity 90%, Mood 70%, Walking Ability 90%, Normal Work 95%, Relation with Other People 70%, Sleep 90%, and Enjoyment of Life 100%.  The pain was worse with activity and movement, and the pain was better with sitting and lying down and he had weakness with the pain.  R. 897.  On examination, he was alert and cooperative; he had "adequate and functional" range of motion in his extremities; he had mild paresthesia in his right C-6 dermatome; and his gait was normal.  Dr. Dedes said that his upper extremity strength was functional and symmetrical; however, "it was difficult to consistently evaluate his strength which may be secondary to guarding from pain or effort."  Wainman had tenderness across his back.  Phalen's test was positive bilaterally, right greater than left.  R. 897.  He had myofascial pain syndrome in his splenius capitis muscles, his trapezius muscles, and his scapula.  Dr. Dedes ordered EMG/nerve conduction studies to evaluate paresthesia and weakness.  R. 899.

On August 14, 2017, Wainman saw Dr. Reynolds, complaining of neck pain.  Wainman was stable at this time.  Dr. Reynolds commented, "Hopefully, people will be able to understand the mechanism of injury and the consequences thereof, and grant him disability."  R. 905.  Dr. Reynolds assessed persistent traumatic myelopathy, incompletely healed, and cervical disc/stenosis with traumatic myelopathy.  R. 905.

On September 20, 2017, Wainman saw neurologist Dr. Daniel Kimple, M.D., for an EMG/nerve conduction study.  R. 952-53.  The study results were normal with no electrodiagnostic evidence of peripheral nerve entrapment neuropathy or cervical radiculopathy.  R. 953.

On September 23, 2017, Wainman saw state agency physician Dr. Raymond Leung, M.D., for a consultative examination.  Wainman reported pain in his neck, upper neck, and chest and that his pain medication helped.  He could walk two blocks and lift 15-20 pounds at most.  Wainman was 70 inches tall and weighed 205 pounds; he was alert and oriented; his memory was intact; his affect was normal, and he was cooperative; and his gait was normal.  He was able to walk 50 feet unassisted, could tandem walk, heel walk, and toe walk, and could squat, but he had difficulty hopping.  He had decreased range of motion in his cervical and lumbar spine; he had no atrophy or spasms.  His strength was 4+/5 throughout and

he had no difficulties getting on and off the exam table.  His sensation was normal.  R. 911-13.

On September 29, 2017, Wainman saw state agency psychologist Fred Stelling, MA, LCP, for a psychological consultation and mental status examination.  R. 918-21.  His affect was appropriate, his mood was euthymic, but became dysphoric later in the exam.  Wainman was oriented, and his memory was intact.  He demonstrated good concentration and good conventional judgment.  R. 918-19.  Stelling concluded that Wainman was "well intact cognitively."   He demonstrated depressive features associated with his chronic pain.  Stelling listed Wainman's report of the psychological effects of his pain:  disturbed sleep, decreased appetite, fluctuating energy that decreased with pain, loss of past interests, depressed mood, diminished self-concept, and anxiety.  Stelling opined that Wainman was credible and not malingering.  R. 920.  Stelling assessed adjustment disorder with mixed anxiety and depressed mood and concluded, "Gordon's fluctuating energy … could project an inconsistently motivated person who would have marked difficulty sustaining a productive pace."  Stelling added, "As long as Gordon's chronic pain persists, the prognosis for sustained improvement in depressive and anxiety features, is guarded."  R. 921.

On October 19, 2017, state agency psychologist Dr. Joseph Mehr, Ph.D., prepared a Psychiatric Review Technique.  R. 78-79.  Dr. Mehr opined that Wainman had depressive and anxiety disorders, but they were non-severe and caused only mild functional limitations.   R. 78-79.

On October 23, 2017, state agency physician Dr. Max Hammer, M.D. prepared a Physical Residual Functional Capacity Assessment.  R. 80-81. Dr. Hammer opined that Wainman could occasionally lift 50 pounds and frequently lift 25 pounds, stand and/or walk six hours in an eight-hour workday, and sit six hours in an eight-hour workday.  Dr. Hammer opined that Wainman had no other functional limitations due to his physical impairments.  R. 81.

On November 14, 2017, Wainman saw Dr. Reynolds.  He reported feeling like insects were crawling under the skin of his forearms, between his shoulder blades, and on his chest.  Dr. Reynolds described the reported feeling as cervical neuropathic pain.  Wainman had mild diffuse weakness and spastic reflexes in his arms and legs.  R. 958.  Dr. Reynolds opined that Wainman was permanently and totally disabled.  R. 959.

On December 13, 2017, Wainman completed a Function Report-Adult form.  R. 251-58.  He reported that he lived alone in a house and typically slept most of the day because his medications made him tired and

because he did not sleep well at night.  He did not sleep well because of pain in his neck, cold feelings in his right arm, and tingling in his right fingers.  He read or watched television during the day when he was awake. He had headaches and pain in his "bones from shoulder to shoulder."  R. 255.  Bending, stretching, reaching overhead, and sitting were painful, and, as a result, he had difficulty with his personal care.  R. 252.  Wainman also had difficulty remembering to take his medications due to drowsiness.  R. 253.

Wainman prepared his own meals and he ate meals ready to heat in a microwave oven, pizza, and hamburgers.  He spent five to six minutes preparing meals, except for pizza, which took 15 minutes.  He did small loads of laundry, loaded and unloaded a dishwasher, and vacuumed, but "not very long" because "vibration hurts."  He needed encouragement from his parents to do these chores. R. 253.

Wainman said he went outside once in a while, but did not go out often "due to back & knee pain, drowsy."  He went out alone and he drove a car.  He shopped for groceries and household supplies in stores and online.  He said he shopped "not very often, not very long, but have to walk slow to keep from hurting to (sic) much."  R. 254.  He went to his parents'

house regularly once or twice a week and spent time with his parents, son, and grandson.  R. 255.

Wainman said that his impairments limited his ability to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, remember, complete tasks, concentrate, and use his hands.  He could walk a block or two but had "to watch his pace" and he could lift 30-35 pounds but lifting that much weight would be painful.  He said he lost attention easily and did not finish what he started.  He could follow instructions if he was paying attention, but he "probably [would] have to go over what needs done."  R. 256.  He got along with authority figures and could handle changes in routine.  Stress tended to cause him to become depressed. R. 257.

Wainman said he had "what feels like a red hot poker in my back once in a while" that was "very painful."  The pain felt "like electricity shooting" inside of him and his muscles felt "like snakes to the locking up to my bones in shoulders hurting real bad."  He had painful numbness in his right thumb and index finger and he had nerve pain in his right arm that ached and burned.  R. 258.  Wainman's back pain was aggravated by weather, lifting, walking, and sitting.  These factors caused his back to stiffen and "lock up it I can not calm it down, will work into chest."  R. 251.

On December 19, 2017, Wainman saw Dr. Kimber for back pain radiating down his spine where surgery was performed.  He rated that pain generally at 6-7/10 up to 9/10 at the worst and rated his pain at the examination at 8/10.  The symptoms had been present for four days and he reported weakness in his arms due to the pain.  Dr. Kimber noted that the EMG/nerve conduction study of his upper and lower extremities was within normal limits throughout.  R. 971.  On examination, Wainman was alert, cooperative, and in no distress; he had moderate midline tenderness in his cervical spine, paraspinous spasm, and range of motion limitations; his extremities were normal; and he had tenderness and paraspinal tenderness throughout his spine.  Wainman could stand on his heels and his toes; straight leg testing was normal; Sperling's maneuver was normal; and his gait was normal.  He had normal range of motion in his hips and lower extremities and he had normal strength and reflexes in his lower extremities.  R. 974.  X-rays of Wainman's cervical spine showed results similar to the May 18, 2017 MRI and x-rays in 2016 and 2015.  R. 995.  Dr. Kimber prescribed a short course of prednisone and gentle stretching.  R. 975.

On January 24, 2018, state agency psychologist, Dr. Leslie Fyans, Ph.D., prepared a Psychiatric Review Technique.  Dr. Fyans opined that

Wainman had depressive and anxiety disorders and said the mental
impairments caused mild functional limitations and were non-severe. R.
91-92.

On January 31, 2018, state agency physician Dr. Michael Nenaber,
M.D., prepared a Physical Residual Functional Capacity Assessment of
Wainman. R. 93-95. Dr. Nenaber opined that Wainman could occasionally
lift 20 pounds and frequently lift 10 pounds, stand and/or walk six hours in
an eight-hour workday, sit for six hours in an eight-hour workday, and
frequently push and pull with his upper extremities. Dr. Nenaber said
Wainman was limited to reaching frequently in front, laterally, and overhead
with both arms. R. 93-95.

On February 8, 2018, Wainman saw Dr. Reynolds. He reported
chest pain that radiated from the front to back. Wainman was five feet nine
inches tall, weighed 204 pounds, and had a body mass index of 30.13. R.
1060-61.

On March 21, 2018, Wainman saw Dr. Kimber. He reported
numbness at the base of his neck and that during the prior week, he
reached into a barrel while standing and suddenly developed severe
numbness across his back and a "killer headache." The pain did not
radiate into his arms. He was taking three Norco 10/325 daily, and

gabapentin.  At the time of the office visit, Wainman's muscles felt "very spastic" but he did not have any paresthesia.  R. 1077.  On examination, Wainman was alert, cooperative, and in no distress; he had limited range of motion in his neck but no tenderness to palpation; he had significant spasm and discomfort to palpation in his bilateral trapezius muscles; and his extremities were normal.  R. 1079.

On March 29, 2018, Wainman saw nurse practitioner Arnold. Wainman reported that two to three weeks earlier he leaned over to pick up an item in a box and when he stood up, he felt a sharp shooting pain from the base of his skull down his spine to his low back which he rated at 8-10/10.  His pain had returned to "'his normal' of a 4 or 5", but he had constant numbness in his right hand at night.  R. 1087.  On examination, he was not in acute distress; he had lumbar tightness without acute spasms; his strength in his upper and lower extremities was 5/5; his gait was steady; and he had mild to moderate neuropathic pain.  Arnold continued his current treatment.  R. 1088.

On May 15, 2018, Wainman saw Dr. Reynolds.  Wainman said he recently bent over to get a piece of paper out of a box and felt a sharp paraspinal pain which lasted for several days.  Before that incident he played golf and pool but could not do so after the incident.  Wainman's

examination showed quadriparesis with weakness in his arms and legs and

spastic reflexes.  The reflexes had improved and Dr. Reynolds assessed

mild quadriparesis; status post C3-C4 disc extrusion with traumatic

quadriparesis, quadriplegia.  Dr. Reynolds found partial healing and post

spinal cord injury pain and opined, "In my opinion from a neurosurgical

standpoint due to incompletely healed quadriparesis with persistent cervical

myelopathy the patient is permanently and totally disabled."  R. 1116.

On June 28, 2018, Wainman saw Dr. Kimber.  Wainman rated his

daily back pain at 6/10 and said the pain was in the neck and cervical spine

and intermittently radiated down to his lumbar spine.  His medication,

hydrocodone, baclofen, and gabapentin alleviated some of his pain, but he

aggravated his pain if he turned his head too much or the wrong way.  He

recently turned his head to the right and felt a sudden pain that went from

his cervical spine up into his head but not down into his arms and this

episode lasted a few minutes.  R. 1130.  On examination, Wainman was

alert, cooperative, and in no distress; he had limited range of motion in his

neck with no tenderness to palpation; he had significant spasm and

discomfort to palpation of his bilateral trapezius muscles; his extremities

were normal; and his bilateral grip strength was 4+/5.  Dr. Kimber

continued Wainman's treatment as before.  R. 1133.

On August 16, 2018, Wainman saw nurse practitioner Arnold.  He reported continued back pain and occasional weakness in his legs, numbness in his right hand and foot, and rated his pain at 9/10.  Wainman was taking baclofen, Norco, Cymbalta, and Valium.  On examination, he was not in acute distress; he had cervical tightness with mild spasms and a guarded range of motion; his gait was steady; he had quadriparesis with weakness in his arms and legs, improved from his last surgery and mild to moderate neuropathic pain.  R. 1138.  Arnold continued his current medications and told Wainman to avoid excessive bending, lifting, or twisting.  R. 1139.

On September 4, 2018, Wainman saw Dr. Kimber.  His pain was constant and he had a pain in his calf that felt "like a red hot poker" which radiated into his feet and toes causing tingling and pain.  Wainman said he continued to have pain that radiated down his right arm into his fingers and also started to feel pain and numbness intermittently in his left arm down to his hand.  R. 1149.  On examination, he was in no distress; he had midline moderate tenderness in his cervical spine, moderate tenderness, and spasms in his cervical paraspinal muscles, and moderately limited range of motion in his neck; Sperling's maneuver was negative and the rest of his spine was normal.  Wainman could stand on his toes and heels and had full

range of motion in the rest of his spine.  His gait was normal; straight leg testing was negative; he had no tenderness and full range of motion in his hips; and he had normal muscle strength and reflexes in his lower extremities.  Dr. Kimber increased the dosage of Norco and gabapentin.  R. 1152.

On December 20, 2018, Wainman saw Dr. Kimber for pain management and rated his back pain at 7-8/10.  R. 1215.  On examination, he was in no apparent distress; he had midline moderate tenderness in his cervical spine, moderate tenderness, and spasms in his cervical paraspinal muscles, and moderately limited range of motion in his neck; Sperling's maneuver was negative; and the rest of his spine was normal.  Wainman could stand on his toes and heels, had full range of motion in the rest of his spine, and his gait was normal.  Straight leg testing was negative.  He had no tenderness and full range of motion in his hips with normal muscle strength and reflexes in his lower extremities.  His strength was 4/5 including his grips, wrists, elbows, and interosseous muscles.  Dr. Kimber increased Wainman's gabapentin dosage.  R. 1217-18.

On January 28, 2019, Wainman saw Dr. Kimber and rated his pain at 8/10.  He noticed improvement from the increase in the gabapentin dosage and said he did not have tingling in his arms and feet since the dosage was

increased.  R. 1230-31.  On examination, he was in no apparent distress; he had midline moderate tenderness in his cervical spine, moderate tenderness, and spasms in his cervical paraspinal muscles, and moderately limited range of motion in his neck.  Sperling's maneuver was negative; his strength was 4/5 in his grips, wrists, elbows, and interosseous muscles.  R. 1232-33.  Dr. Kimber added baclofen to Wainman's medications.  R. 1233.

On February 21, 2019, Wainman saw nurse practitioner Arnold. Wainman reported bilateral leg weakness and hand weakness and stated he had been dropping items.  He said that his balance was off, but he denied falling.  He had frequent headaches and his pain was worse in the winter and he was having more spasms.  When he took Norco, his pain was 5 or 6/10.  R. 1268.  On examination, he was in no acute distress; his gait was steady; he had quadriparesis in his arms and legs but improved since his last surgery; his strength in his biceps, triceps, and grips were 4-/5, and his strength in his deltoids was 4/5; and he had moderate to significant neuropathic pain.  Arnold continued his current medications and instructed him to avoid excessive bending, lifting, or twisting.  R. 1268-69.

On February 28, 2019, Wainman saw Dr. Kimber for pain management and rated his pain at 6/10.  He had pain and numbness in his

right hand and the back of his neck.  His Norco, baclofen, and gabapentin were helping with the pain.  R. 1275.  On examination, he was in no apparent distress; he had midline moderate tenderness in his cervical spine, moderate tenderness, and spasms in his cervical paraspinal muscles, and moderately limited range of motion in his neck; Sperling's maneuver was negative; his strength was 4/5 in his grips, wrists, elbows, and interosseous muscles.  Dr. Kimber decreased his gabapentin dosage. R. 1277-78.

On March 7, 2019, Dr. Reynolds completed a form entitled, "Medical Source Statement Ability to do Work-Related Activities (Physical)" (Medical Source Statement).  R. 1263-66.  Dr. Reynolds opined that Wainman could occasionally and frequently lift less than 10 pounds, stand and walk for less than two hours in an eight-hour workday, and sit for less than two hours in an eight-hour workday.  He could sit for an hour before he needed to change positions; Dr. Reynolds added "must sit in recliner."  Wainman had to walk around 12 times in an eight-hour workday, each time for 10 minutes; shift at will from sitting to standing to walking; and lie down at unpredictable intervals during an eight-hour workday.  Dr. Reynolds added, "Need ability to sit in recliner/bed 4x during 8hour day."  R. 1263.

Dr. Reynolds further opined on the Medical Source Statement that Wainman could never twist, stoop, crouch, or climb ladders; and he could occasionally climb stairs; he could occasionally reach and handle, and frequently finger and feel.  Dr. Reynolds indicated that Wainman could both never and occasionally push and pull with his upper extremities.  He opined that Wainman could never push or pull with his lower extremities. Wainman must avoid concentrated exposure to high humidity; moderate exposure to extreme heat and cold, and perfumes; and all exposure to fumes, dust, odors, gases, soldering fluxes, solvents/cleaners, and chemicals. R. 1264-65.

Dr. Reynolds based all of these opinions on the findings of his May 15, 2018 examination.  R. 1263-65.

Dr. Reynolds further opined that Wainman would be absent from work due to his impairments more than four days a month and would be off-task 25 percent or more of the workday.  He based these two opinions on Wainman's muscle weakness and pain due to incompletely healed quadriparesis with persistent cervical myelopathy and added that Wainman was "permanently and totally disabled."  Dr. Reynolds agreed with Wainman's allegation that his disability began on the Onset Date, July 23, 2015.  R. 1266.

## The Evidentiary Hearing

On March 15, 2019, the ALJ conducted an evidentiary hearing.  R. 41-74.  Wainman appeared in person and with his counsel.  A vocational expert Deborah Determan also appeared by telephone.  R. 43.

Wainman lived in a house with his 26-year-old son.  Since the Onset Date, he had headaches two to three times a day which lasted 20 to 50 minutes and caused nausea and light sensitivity.  He vomited two to three times a day due to the nausea and took hydrocodone and Tylenol when he got a headache.  In addition to the headaches, Wainman got dizzy from walking, and the muscles in his back locked up.  He experienced dizziness 80 to 85 percent of the time since the Onset Date and had fallen due to the dizziness.  He lay in bed due to all these symptoms.  He took three or more naps a day, with each nap lasting an hour to an hour and a half.  He lay in bed each day for six hours during the period from 9:00 a.m. to 5:00 p.m.  R. 54-56, 64-65.

Wainman also had continuous neck pain that radiated down his back, into his shoulders, and down his arms.  He had numbness in his right arm and pain and numbness in his right hand once a day lasting from 15 minutes to "at least an hour."  Forty percent of the time the pain and numbness in his right arm and hand lasted at least an hour.  Bending over

and reaching in front and overhead caused pain and numbness in his right arm and hand.  Reaching overhead with either arm caused his back muscles to lock up.  He also had problems gripping objects such as cups and plates.  Wainman's doctors told him that he had gripping problems because he had nerves that still had not healed.  When the pain was bad, he took hydrocodone and he sat or lay down to relax.  He also had pain and numbness 40 percent of the time in his left arm and hand.  R. 57-61.

Wainman had to change positions regularly when he was lying down or sitting in a recliner due to neck pain.  He either stood up for a while or changed position in the bed or recliner.  R. 63.

Wainman opined that he could lift a maximum of 10 pounds without pain, but repeated lifting caused his back and shoulder muscles "seizing up and creating pain."  R. 64.

Vocational expert Determan then testified.  The ALJ asked Determan the following hypothetical question:

> Q Now if you assume a person of claimant's age, education and work experience who's able to perform light work; never climb ladders, ropes or scaffolds; never crawl; occasionally climb ramps, stairs, stoop, kneel and crouch; also never balance; never overhead reach; frequently reach in other directions; frequently handle and finger; avoid concentrated exposure to excessive vibration; avoid all exposure to work place hazards such as operational control of moving machinery and unprotected heights. Would such a person be able to perform claimant's past work?

R. 69.  Determan said that such a person could not perform Wainman's past work.  R. 69.  Determan said that the person could perform the representational jobs of routing clerk, with 30,000 such jobs in the national economy; office helper, with 10,000 such jobs in the national economy; and information clerk, with 70,000 such jobs in the national economy.  R. 72.

The ALJ further asked Determan to assume that the person was limited to occasional reaching, handling, and fingering.  Determan stated the Department of Labor's Dictionary of Occupational Titles (DOT) indicated that such a person could perform the jobs of counter clerk, with 18,000 such jobs in the national economy; and bakery line worker with 700 such jobs in the national economy.  Determan, however, stated that in her experience these two jobs involved more than occasional reaching, handling, and fingering.  R. 70-72.

Determan said that a person could not work if he needed to take more than regularly scheduled breaks and would need to lie down during such breaks.  R. 72-73.  The hearing concluded.

<u>THE DECISION OF THE ALJ</u>

On May 30, 2019, the ALJ issued his decision.  R. 11-26.  The ALJ followed the five-step analysis set forth in Social Security Administration Regulations (Analysis).  20 C.F.R. §§ 404.1520, 416.920.  Step 1 requires

that the claimant not be currently engaged in substantial gainful activity.  20

C.F.R. §§ 404.1520(b), 416.920(b).  If true, Step 2 requires the claimant to

have a severe impairment.  20 C.F.R. §§ 404.1520(c), 416.920(c).  If true,

Step 3 requires a determination of whether the claimant is so severely

impaired that he is disabled regardless of his age, education, and work

experience.  20 C.F.R. §§ 404.1520(d), 416.920(d).  To meet this

requirement at Step 3, the claimant's condition must meet or be equal to

the criteria of one of the impairments specified in 20 C.F.R. Part 404

Subpart P, Appendix 1 (Listing).  20 C.F.R. §§ 404.1520(d), 416.920(d).  If

the claimant is not so severely impaired, the ALJ proceeds to Step 4 of the

Analysis.

Step 4 requires the claimant not to be able to return to his prior work

considering his age, education, work experience, and Residual Functional

Capacity (RFC).  20 C.F.R. §§ 404.1520(e) and (f), 416.920(e) and (f).  If

the claimant cannot return to his prior work, then Step 5 requires a

determination of whether the claimant is disabled considering his RFC,

age, education, and past work experience.  20 C.F.R. §§ 404.1520(g),

404.1560(c), 416.920(g), 416.960(c).  The claimant has the burden of

presenting evidence and proving the issues on the first four steps.  The

Commissioner has the burden at Step 5 to present evidence that,

considering the listed factors, the claimant can perform some type of gainful employment that exists in the national economy.  20 C.F.R. §§ 404.1512, 404.1560(c); <u>Weatherbee v. Astrue</u>, 649 F.3d 565, 569 (7th Cir. 2011); <u>Briscoe ex rel. Taylor v. Barnhart</u>, 425 F.3d 345, 352 (7th Cir. 2005).

The ALJ found that Wainman met his burden for Steps 1 and 2 of the Analysis.  He had not worked since the Onset Date of July 23, 2015, and he had the severe impairments of degenerative disc disease status-post fusion at C3-4, mild quadriparesis, and obesity.  R. 14-15.  The ALJ found at Step 3 that Wainman's impairments or combination of impairments did not meet or equal a Listing.  R. 16.

At Step 4, the ALJ determined that Wainman had the following RFC:

> After careful consideration of the entire record, the undersigned finds that since July 23, 2015, the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except never climb ladders, ropes, or scaffolds; never crawl or balance; occasionally climb ramps and stairs; occasionally stoop, kneel, and crouch; never reach overhead but can frequently reach in other directions, handle and finger. He should avoid concentrated exposure to excessive vibration and all exposure to workplace hazards such as operational control of moving machinery and unprotected heights.

R. 16.  The ALJ relied on Dr. Leung's consultative examination; Dr. Nenaber's opinions; medical examinations that showed only mild quadriparesis, slight decrease in strength in the 4+/5 range, a steady gait, an ability to walk unassisted, no muscle atrophy or spasms; and the

opinions of psychologists Drs. Mehr and Fyans that Wainman's mental impairments were non-severe.  R. 16-23.

The ALJ rejected Dr. Reynolds' opinions in the Medical Source Statement because he found that the opinions were not consistent with the record or supportable.[1]  The opinions were not consistent with Dr. Reynolds' diagnosis of only mild quadriparesis.  Dr. Reynolds did no testing to determine the cause of the quadriparesis and did not rule out a mechanical cause for the condition.  The ALJ further found that Wainman's claims of leg weakness, on which Dr. Reynolds relied, were inconsistent with findings that he had a steady gait and could ambulate without an assistive device. The claims of weakness were also inconsistent with other medical examinations that found slight reductions in strength, no muscle atrophy, and no spasms.  The claims of weakness were also inconsistent with Dr. Leung's observation that Wainman could get on and off the examination table.  R. 23.

The ALJ also rejected Stelling's opinions as not supported and not consistent with the other evidence in the record.  The ALJ noted that Stelling relied only on Wainman's subjective reports of the functional effects

---

[1] The ALJ found that the various medical orders directing him not to work or imposing lifting restrictions or other restrictions were temporary in nature and did not indicate a permanent disability.  R. 22.  Wainman does not challenge this finding on appeal.

of his pain.  Moreover, Stelling's opinions were inconsistent with his own findings that Wainman was cognitively intact, fully oriented, and had normal behavior, attention, concentration, memory, cognition, insight, and judgment.  R. 22-23.

After determining the RFC, the ALJ found that Wainman could not perform his prior work as a letter carrier, mail sorter, cable television installer, or foam charger.  R. 23-24.

At Step 5, the ALJ determined that Wainman was not disabled before July 17, 2018, the day before his 55th birthday.  The ALJ relied on the Medical-Vocational Guidelines (Guidelines), 20 C.F.R. Part 404, Subpart P, Appendix 2, and the testimony of vocational expert Determan.  The Guidelines classify persons between ages 50 and 54 as approaching advanced age, and persons 55 and older as advanced age.  Guidelines, § 201.00(d) and (g).  Different Guidelines Rules apply to these two groups.  The ALJ found that prior to turning 55 years of age, Guidelines Rule 202.14 applied to Wainman.  Rule 202.14 provided that a person with Wainman's age (under 55), education, and work experience would not be disabled if he had the RFC to perform a full range of light work.  Wainman's RFC limited him to a reduced range of light work, so the ALJ relied on Determan's opinion that Wainman could perform the representative jobs of routing

clerk, office helper, and information clerk.  The ALJ determined that Wainman could perform a significant number of jobs in the national economy before his 55th birthday, and so, was not disabled.  R. 24-25.

The ALJ determined, however, that Wainman became disabled on his 55th birthday, July 18, 2018.  Under the Guidelines, Wainman became a person of advanced age on that day, and so, Guidelines Rule 202.06 applied.  Rule 202.06 provided that a person with Wainman's age (55), education, and work experience would be disabled even if he could perform a full range of light work.  Wainman only had the RFC to perform a limited range of light work.  The ALJ, therefore, found that Rule 202.06 dictated at Step 5 in the Analysis that Wainman became disabled on July 18, 2018, when he became 55 years old and reached advanced age.  R. 25.

Wainman appealed the finding that he was not disabled from the Onset Date of July 23, 2015 through July 17, 2018.  On April 14, 2020, the Appeals Council denied Wainman's request for review.  The ALJ's decision then became the final decision of the Commissioner.  R. 1.  Wainman then filed this action for judicial review.

## ANALYSIS

This Court reviews the ALJ's Decision as the final decision of the Commissioner to determine whether it is supported by substantial

evidence.  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate" to support the decision.  <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971).  This Court must accept the findings if they are supported by substantial evidence and may not substitute its judgment or reweigh the evidence.  <u>Jens v. Barnhart</u>, 347 F.3d 209, 212 (7th Cir. 2003); <u>Delgado v. Bowen</u>, 782 F.2d 79, 82 (7th Cir. 1986).  This Court will not review the ALJ's evaluation of statements regarding the intensity, persistence, and limiting effect of symptoms unless the evaluation is patently wrong and lacks any explanation or support in the record.  <u>See Pepper v. Colvin</u>, 712 F.3d 351, 367 (7th Cir. 2014); <u>Elder v. Astrue</u>, 529 F.3d 408, 413-14 (7th Cir. 2008); SSR 16-3p, 2017 WL 5180304, at *1 (October 25, 2017) (The Social Security Administration no longer uses the term credibility in the evaluation of statements regarding symptoms).  The ALJ must articulate at least minimally her analysis of all relevant evidence.  <u>Herron v. Shalala</u>, 19 F.3d 329, 333 (7th Cir. 1994).  The ALJ must "build an accurate and logical bridge from the evidence to his conclusion."  <u>Clifford v. Apfel</u>, 227 F.3d 863, 872 (7th Cir. 2000).

The ALJ's decision was supported by substantial evidence.  The RFC finding was supported by substantial evidence.  Numerous medical examinations found that Wainman had slightly reduced strength in the 4/5

range, had a steady gait and could ambulate without assistance, had normal range of motion in his extremities, and had negative straight leg tests. Imaging also showed that the second surgery resolved Wainman's central canal stenosis, spinal cord compression, and nerve root compression; and that the condition of his cervical spine otherwise remained stable since the Onset Date. The EMG/nerve conduction study also was normal. Dr. Nenaber's opinions and Dr. Leung's consultative examinations also supported the RFC finding. All this evidence is sufficient to constitute substantial evidence to support the RFC. The RFC, the Guidelines, and the opinions of vocational expert Determan provide substantial evidence to support the ALJ's findings that Wainman became disabled on his 55th birthday, but not before.

Wainman argues that the ALJ was not qualified to formulate the RFC because he was a mere layman and not a medical professional. The argument is not persuasive because the regulations authorize and direct the ALJ to assess a claimant's RFC. 20 C.F.R. §§ 404.1545(a), and 404.1526(c); see also 404.1520b(c)(3) (determination of disability is an issue reserved to the Defendant Commissioner). The ALJ cannot base the RFC on his own opinions rather than the evidence in the record. See e.g., Rohan v. Chater, 98 F.3d 966, 971 (7th Cir. 1996). The ALJ, however, is

authorized and directed by the regulations to evaluate the evidence,

determine the RFC based on the evidence, and explain the basis for that

determination.  The ALJ did so here and relied on the evidence cited

above.  There was no error.

Wainman argues that the ALJ erred in evaluating Dr. Reynolds'

opinions in his Medical Source Statement.[2]  The ALJ evaluated Dr.

Reynolds' opinions under a rule that became effective for all applications

for Disability Benefits filed on or after March 27, 2017.  20 C.F.R.

404.1520c.  Section 404.1520c sets forth how an ALJ will evaluate medical

opinions.  Section 404.1520c(a) states, in part:

> (a) How we consider medical opinions ….  We will not defer or
> give any specific evidentiary weight, including controlling
> weight, to any medical opinion(s) … including those from your
> medical sources. When a medical source provides one or more
> medical opinions …, we will consider those medical opinions …
> from that medical source together using the factors listed in
> paragraphs (c)(1) through (c)(5) of this section, as appropriate.
> The most important factors we consider when we evaluate the
> persuasiveness of medical opinions … are supportability ….
> and consistency ….  We will articulate how we considered the
> medical opinions and prior administrative medical findings in
> your claim according to paragraph (b) of this section.

20 C.F.R. § 404.1520c(a) (emphasis added).  Section 404.1520c(c) lists

five factors for the ALJ to consider, as appropriate: (c)(1) supportability,

---

[2] Wainman did not challenge the ALJ's assessment of any other opinions in the record.

(c)(2) consistency, (c)(3) relationship with the claimant, (c)(4) specialization, and (c)(5) other factors relevant to the particular case.  As quoted above, the most important considerations are supportability and consistency.

Section 404.1520c(b) sets forth how the ALJ will articulate his consideration of the medical opinion.  The ALJ may discuss multiple opinions collectively and is not required to discuss each opinion individually.  § 404.1520c(b)(1).  Subsection (b)(2) reiterates that factors of supportability and consistency "are the most important factors."  The subsection concludes:

> Therefore, <u>we will explain</u> how we considered the <u>supportability</u> and <u>consistency</u> factors for a medical source's medical opinions ….  <u>We may, but are not required to, explain</u> how we considered the <u>factors in paragraphs (c)(3) through (c)(5)</u> of this section, as appropriate, when we articulate how we consider medical opinions and prior administrative medical findings in your case record.

20 C.F.R. § 404.1520c(b)(2) (emphasis added).  The ALJ, therefore, must discuss supportability and consistency of an opinion, but generally is not required to discuss the other three factors for the opinion.

The ALJ must explain how the factors in paragraphs (c)(3) through (c)(5) apply if the record contains two opinions that are equally supportable and consistent.   In the case of two such equal opinions, the ALJ "will

articulate how we considered the other most persuasive factors in paragraphs (c)(3) through (c)(5) of this section for those medical opinions or prior administrative medical findings in your determination or decision." 20 C.F.R. § 404.1520c(b)(3).  Wainman did not submit two opinions from his treating physicians, so subsection (b)(3) does not apply in this case.

Wainman argues that the ALJ erred by not discussing all five factors of § 404.1520c(c).  The Court disagrees.  The ALJ discussed the supportability and consistency of Dr. Reynolds' opinions, but did not discuss the other three factors.  R. 23.  Section 404.1520(b)(2), quoted above, states that ALJ "will" address supportability and consistency and "may, but [is] not required to," address the other three factors set forth in § 404.1520c(c).  The ALJ followed the regulation.  The Court sees no error.

Wainman argues that the ALJ must discuss all five factors to minimally articulate his consideration of all the relevant evidence.  See Herron, 19 F.3d at 333.  Wainman argues that § 404.1520(a)(1) requires the ALJ to consider all five factors in § 404.1520c(c), and so, the Court cannot conduct meaningful judicial review of the ALJ's consideration of the factors in § 404.1520c(c)(3)-(c)(5) (relationship with the claimant, specialization, and other relevant factors) if the ALJ is not required to

articulate his consideration of those factors.  See Plaintiff's Reply to Defendant's Motion for Summary Judgment (d/e 18), at 2.

The Court disagrees.  Section 404.1520c(a) does not state that the ALJ will consider all five of the § 404.1520c(c) factors in every case. Section 404.1520c(a) states that the ALJ will consider the § 404.1520c(c) factors, "as appropriate."  The regulation also states that supportability and consistency are the most important factors.  The regulation, therefore, only requires the ALJ to consider supportability and consistency in every case, and the other factors "as appropriate."  Section 404.1520(b) also specifically states that the ALJ is not required to discuss the other factors in every case.[3]  The ALJ cited substantial evidence to support his conclusion that Dr. Reynolds' opinions lacked supportability and consistency.  The ALJ, under the express language of § 404.1520c minimally articulated his consideration of the relevant evidence.  There was no error.

An exceptional case may occur in which the evidence shows that one of the other three factors (relationship with the claimant, specialization, and other relevant factors) is so important that a Court must remand to require the ALJ to articulate his consideration of that factor.  The facts would need

---

[3] The ALJ must only discuss all five § 404.1520c(c) factors if a claimant presents two opinions with the same supportability and consistency.  §404.1520(b)(3).  Wainman only presented Dr. Reynolds' opinion, so subsection (b)(3) does not apply.

to be truly exceptional to find that the ALJ must do what the regulations say he is not required to do.  This is not such an exceptional case.

Wainman finally argues that he has a property interest in Disability Benefits, and so, due process requires the ALJ to address all five factors in § 404.1520c(c).  Reply, at 2.  Wainman is incorrect.  An individual who has been awarded Disability Benefits has a property interest in benefits. Mathews v. Eldridge, 424 U.S. 319, 332 (1976).  Wainman has not been awarded benefits for the period from the onset of July 23, 2015 through July 17, 2018, so he has no property interests in those benefits at this time. His due process argument does not apply.  While he does have a property interest in his benefits awarded for the period after July 17, 2018, those benefits are not challenged.

THEREFORE, IT IS ORDERED that Defendant Commissioner of Social Security's Motion for Summary Affirmance (d/e 17) is ALLOWED; Plaintiff Gordon W. Wainman's Brief in Support of Motion for Summary Judgment (d/e 16) is DENIED, and the decision of the Defendant Commissioner is AFFIRMED.  THIS CASE IS CLOSED.

ENTER:   May 4, 2021

_____s/ *Tom Schanzle-Haskins*_____
TOM SCHANZLE-HASKINS
UNITED STATES MAGISTRATE JUDGE